Marc Anthony Lowell ENDSLEY,
Plaintiff,

v.

Octavio LUNA, Nirbhay Singh, Jon Benson, Denise Armas–Carl, Millicent Loyarte, Jonathan Monroe, Jim Birks, Roy Bellamy, Ed Sireger and Jennifer Atkins, Defendants.

No. CV 06–6961 DSF (SS).

United States District Court,
C.D. California.

Aug. 5, 2010.

Marc Anthony Lowell Endsley Atascadero, CA, pro se.

Benjamin Barnouw, CAAG-California Attorney General, Los Angeles, CA, for Defendants.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

DALE S. FISCHER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Third Amended Complaint, all of the records and files herein, and the Magistrate Judge's Amended Report and Recommendation. The time for filing Objections to the Amended Report and Recommendation has passed and no Objections have been received. Accordingly, the Court accepts and adopts the findings, conclusions and recommendations of the Magistrate Judge.

Accordingly, IT IS ORDERED THAT:

1. Plaintiff's Motion for Partial Summary Judgment is DENIED.

2. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claims under 42 U.S.C. § 1983.

3. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claims under state law.

4. Plaintiff's state law claims are DISMISSED with prejudice.

5. Plaintiff's claims for injunctive and declaratory relief are DISMISSED as moot.

6. Judgment shall be entered in favor of the Defendants and against Plaintiff on the entire Complaint. Plaintiff's entire Complaint shall be dismissed with prejudice.

7. The Clerk shall serve copies of this Order and the Judgment herein by United States mail on Plaintiff and counsel for Defendants.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SUZANNE H. SEGAL, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Dale S. Fischer, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

Plaintiff Marc Anthony Lowell Endsley ("Plaintiff"), proceeding *pro se*, filed a Civil Rights Complaint pursuant to 42 U.S.C. § 1983, which the Court dismissed with leave to amend due to various deficiencies. The Court also dismissed with leave to amend Plaintiff's subsequently filed First Amended Complaint and Second Amended Complaint.

Plaintiff filed the operative Third Amended Complaint ("Third Amended Complaint" or "TAC") on March 20, 2008, naming ten individuals who are or were employees at Patton State Hospital ("Patton") as defendants. By Notice of Change of Address dated June 6, 2008 ("Address Change"), Plaintiff informed the Court that he had been transferred from Patton to Atascadero State Hospital. Defendants Luna, Bellamy, Birks, Atkins, and Monroe filed a Motion to Dismiss the Third Amended Complaint ("First Motion to Dismiss") in which Defendants Siregar and Benson later joined. Defendants Armas–Carl and Loyarte filed a separate Motion to Dismiss the Third Amended Complaint. Plaintiff opposed both Motions to Dismiss. The District Court granted Defendants' Motions to Dismiss in part, dismissing without prejudice Plaintiff's claims under the Americans with Disabilities Act, as well as all of Plaintiff's claims against Defendant Singh. The remaining nine Defendants (collectively, "Defendants") filed an Answer to the Third Amended Complaint.

Defendants filed a Motion for Summary Judgment ("Defendants' MSJ"), along with a Proposed Statement of Uncontroverted Facts and Conclusions of Law ("Defendants' SUF") and twelve Declarations in support of Defendants' MSJ.[1] Defendants' MSJ was also supported by Defendants'

---

1. Defendants filed Declarations from Octavio Carlos Luna ("Luna Decl."); John Benson, M.D. ("Benson Decl."); Roy Bellamy ("Bellamy Decl."); Denise Armas–Carl ("Armas–Carl Decl."); Millicent Loyarte ("Loyarte Decl."); James Birks ("Birks Decl."); Jonathan Monroe ("Monroe Decl."); Eddin Siregar ("Siregar Decl."); Jennifer Atkins ("Atkins Decl."); Holly Melvin, L.C.S.W. ("Melvin Decl."); Hope Marriot, L.C.S.W. ("Marriot Decl.");

Request for Judicial Notice in Support of the First Motion to Dismiss ("Request for Judicial Notice"). As required by *Rand v. Rowland*, 154 F.3d 952, 960–61 (9th Cir. 1998), the Court issued an "Order Re Summary Judgment Protocol and Briefing Schedule" which informed Petitioner of his rights under Federal Rule of Civil Procedure 56 and attached a copy of the text of the Rule.

Plaintiff filed his Motion for Partial Summary Judgment along with a "Memorandum of Law" supporting the Motion and opposing Defendant's MSJ ("Plaintiff's MPSJ"). Plaintiff also filed a Declaration in Support of Plaintiff's Motion for Partial Summary Judgment ("Endsley Decl.") and a Statement of Uncontroverted Facts and Conclusions of Law ("Plaintiff's SUF"). Defendants filed a Reply in Support of Defendants' MSJ ("Reply") and an Opposition to Plaintiff's MPSJ ("Defendants' Opposition"), which was supported by a Declaration of Benjamin Barnouw ("Second Barnouw Decl.") and a Statement of Genuine Issues of Material Fact ("Defendants' SGI"). Plaintiff did not file a response to Defendants' Opposition.

This matter is now ready for decision. For the reasons discussed below, it is recommended that Defendants' Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Partial Summary Judgment be DENIED.

## II.

## REMAINING ALLEGATIONS OF THE THIRD AMENDED COMPLAINT

██ In 1997, Plaintiff was committed to Patton State Hospital ("Patton"), a psychiatric hospital facility operated by the California Department of Mental Health. (TAC at 6). Plaintiff was committed to Patton after being charged with murder and found not guilty by reason of insanity. (*Id.*; Request for Judicial Notice, Exh. C).[2]

---

and Benjamin Barnouw ("Barnouw Decl."). Exhibit 1 to the Barnouw Declaration is a copy of Plaintiff's June 19, 2009 Deposition transcript. Citations to this deposition herein will be designated "Endsley Depo." and will refer to the page and line number of the deposition transcript.

2. Defendants request that the Court take judicial notice of six documents issued in either the instant case or cases relevant to the issues presented in the instant case: (1) Order Denying Ex Parte Application for Relief and Setting Briefing Schedule for Preliminary Injunction, July 10, 2007 (Request for Judicial Notice, Exh. A); (2) Order Denying Plaintiff's Motion for Preliminary Injunction, Sept. 4, 2007 (*id.*, Exh. B); (3) Criminal Minute Order, Case No. FSB07901 (Cal. Sup. Ct. May 12, 1997) (*id.*, Exh. C); (4) Consent Judgment, *United States v. California, et al.*, Case No. CV 06–2667 (C.D.Cal. May 15, 2006) ("Consent Judgment") (*id.*, Exh. D); (5) Order Amending Consent Judgment and Agreement, *United States v. California, et al.*, Case No. CV 06–2667 (C.D.Cal. Aug. 16, 2006) ("Order Amending Consent Judgment") (*id.*, Exh. E); (6) Amended Consent Judgment, *United States v. California, et al.*, Case No. CV 06–2667 (C.D.Cal. Feb. 27, 2007) ("Amended Consent Judgment") (*id.*, Exh. F); Memorandum and Order Dismissing First Amended Complaint with Leave to Amend, Oct. 19, 2007 (*id.*, Exh. G). Defendants' Request for Judicial Notice is GRANTED. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) (noting a court may take notice of proceedings in other courts, both within and without the federal judicial system, if proceedings directly relate to matters at issue); *see also Biggs v. Terhune*, 334 F.3d 910, 915 n. 3 (9th Cir.2003) (noting materials from a proceeding in another tribunal are appropriate for judicial notice).

The Court also takes judicial notice of a document dated May 2, 2006, from Wan J. Kim of the Civil Rights Department of the United States Department of Justice to Arnold Schwarzenegger, Governor of California, re: Patton State Hospital, Patton, California ("Patton Report"), which is referenced in Plaintiff's Third Amended Complaint. Letter from Wan J. Kim, Assistant Atty. Gen., U.S. Dept. of Justice, to Arnold Schwarzenegger, Governor of Cal. (May 2, 2006), *available at* http://www.usdoj.gov/crt/split/documents/

In November 2004, Plaintiff's residential housing program implemented "a highly structured model of service delivery called Mall Treatment."[3] (TAC at 6).

The following persons remain defendants: Octavio Luna, the warden/executive director at Patton; John Benson (erroneously sued as Jon Benson), Plaintiff's former psychiatrist; Denise Armas–Carl, Millicent Loyarte, Ed Sireger, Jonathan Monroe and Jennifer Atkins, psychiatric technicians; Jim Birks, a nursing coordinator; and Roy Bellamy, a unit supervisor. (Id. at 3–5). Plaintiff sues each of these persons in his or her individual capacity. (Id.). Plaintiff seeks declaratory and injunctive relief, as well as $600,000 in compensatory damages and $290,000 in punitive damages.[4] (See id. at 16–18).

Plaintiff asserts three civil rights claims as well as various state law tort claims. (Id. at 6). In Claim One, Plaintiff asserts that Defendants' implementation of Mall Treatment deprived him of adequate care in violation of the Fourteenth Amendment. (Id. at 7–9). Specifically, Plaintiff claims that the Mall Treatment program, including the requirement that patients who do not participate in Mall Treatment convene in a "Refusal Room," does not conform to professional standards nor to the terms of a Consent Judgment involving Patton. (Id.; see also Request for Judicial Notice, Exhs. D, E). Plaintiff further complains that the revocation of his Industrial Therapy assignment[5] and of his right to participate in Patton's patient government constituted punishment in violation of his Fourteenth Amendment rights. (TAC at 8).

In Claim Two, Plaintiff alleges that on seven occasions between December 2004 and July 2005 various Defendants used excessive force against Plaintiff in violation of the Fourteenth Amendment. (Id. at 10–13). One of these incidents allegedly occurred while Plaintiff was in a "Refusal Room" after refusing to attend Mall treatment and consisted of a hospital employee pulling or attempting to pull a chair out from under him. (Id. at 10). Six other incidents of force allegedly occurred after Plaintiff balked at attending Mall Treatment and refused to go to the Refusal Room. These incidents largely consisted of hospital employees "dragg[ing]" Plaintiff

---

patton—hosp_findlet_5-2-06.pdf; see al-Kidd v. Ashcroft, 580 F.3d 949, 955 n. 6 (9th Cir. 2009) (taking judicial notice of an official government document from the Department of Justice referenced in, but not attached to, a pleading).

3. At Patton, "Psychosocial Rehabilitation Mall" ("Mall Treatment") was a structured program that provided all patients with treatment for four hours per day for a total of twenty hours per week. (Benson Decl. at 7, ¶ 19; Luna Decl. at 4–5, ¶ 11). Mall Treatment included group therapy sessions on particular topics lasting for a period of ten weeks. Patients would choose topics in consultation with their treatment teams. (Benson Decl. at 7–8, ¶ 20; Birks Decl. at 2, ¶ 4). Individual psychotherapy and other treatment available during Mall Treatment hours would also count towards the twenty hour per week requirement. (Benson Decl. at 8, ¶ 21).

4. Plaintiff seeks compensatory damages of $50,000 against Defendant Bellamy; $50,000 jointly and severally against Defendants Armas–Carl, Loyarte, Monroe, and Birks; and $500,000 jointly and severally against Defendants Luna and Benson. (TAC at 17). Plaintiff seeks punitive damages of $20,000 each against Defendants Bellamy, Armas–Carl, Loyarte, Monroe, Birks, Sireger, Atkins; $50,000 against Defendant Benson; and $100,000 against Defendant Luna. (TAC at 17–18). Plaintiff's $1,000,000 claim against Nirbhay Singh has been dismissed. See Order Adopting and Modifying Findings, Conclusions and Recommendations of United States Magistrate Judge, Mar. 23, 2009.

5. "Industrial Therapy" assignments are paying jobs that some Patton patients are allowed to hold. (Benson Decl. at 2, ¶ 3).

from a room using physical force. (*Id.* at 10–11). Plaintiff claims that these actions also constituted the torts of harassment, assault, and battery. (*Id.*). In one of these incidents, Plaintiff alleges that Defendants Atkins and Siregar falsely reported in his medical records that Plaintiff "swung" at them. Plaintiff accuses these Defendants of perjury. (*Id.* at 11).

In Claim Three, Plaintiff contends that the overcrowded and unsanitary conditions in the Refusal Room constituted punishment designed "to 'annoy' patients into going to Mall" in violation of his Fourteenth Amendment rights. (*Id.* at 14–15). Plaintiff also claims that Defendant Birks "rang a radio in [P]laintiff's ear when [P]laintiff attempted to sleep in Refusal." (*Id.* at 14). Furthermore, Plaintiff claims that Defendants denied him the use of his property while in the Refusal Room, constituting "the tort of deprivation of personal property" under California Code of Regulations, title 9, section 884(b)(1). (*Id.*).

## III.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants assert that they are entitled to summary judgment on all of Plaintiff's claims. Defendants argue that Plaintiff's inadequate medical care claim fails because, pursuant to *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), "the Constitution only requires that the courts make certain that professional judgment in fact was exercised" when ruling on a claim of inadequate medical care by an involuntarily confined individual. (Defendants' MSJ at 14). Defendants note that the Mall Treatment program was based upon professional judgment (*id.* at 14, 15), and decisions with regard to Plaintiff's participation in the Mall program were taken in the exercise of professional judgment (*id.* at 17). Defendants further note that Plaintiff could

have avoided the Refusal Room and other consequences, such as the ban on his participation in Industrial Therapy and patient government, by participating in the Mall program. (*Id.*). At the very least, Defendants argue, Defendant Luna is entitled to qualified immunity on this claim because his actions in structuring the Mall Treatment program did not violate clearly established law. (*Id.* at 16).

Regarding Plaintiff's excessive force claims, Defendants assert that there was no constitutional violation because any force used did not constitute "punishment" prohibited by the Fourteenth Amendment. (*Id.* at 18); *see Bell v. Wolfish*, 441 U.S. 520, 534–35, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (stating that "the proper inquiry" in determining the constitutionality of conditions or restrictions of detention that is not the result of criminal conviction "is whether those conditions amount to punishment of the detainee"). Defendants argue that any force used did not rise to the level of punishment because it was either *de minimis* or rationally related to the need to restore order and maintain discipline. (Defendants' MSJ at 19, 22); *see Bell*, 441 U.S. at 538–39 & n. 21, 99 S.Ct. 1861 (holding that where a restriction that is greater than *de minimis* is imposed, the "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose"). To the extent that Plaintiff claims that liability should attach because certain Defendants were enforcing an unconstitutional rule, Defendants assert that the rule mandating attendance in the Refusal Room for patients who refuse Mall treatment is constitutional because any imposition caused by the rule is *de minimis* or, if not, the policy is rationally related to safety concerns. (Defendants' MSJ at 21). Alternatively, Defendants argue they are entitled to qualified immunity because any

unconstitutionality was not clearly established at the time of the alleged violation. (*Id.* at 21–22).

Defendants argue that they are entitled to summary judgment on Plaintiff's claims regarding the Refusal Room conditions because any hardship imposed by the conditions was *de minimis* or was necessitated by the fact that the institution has limited space. (*Id.* at 22–23). Additionally, Defendants argue that there is no evidence that the allegedly overcrowded and unsanitary conditions were imposed for the purpose of punishment. (*Id.* at 23). They also point out that, had Plaintiff participated in Mall treatment, he could have avoided the Refusal Room altogether. (*Id.*). Moreover, they assert that, even if the conditions amounted to unconstitutional punishment, Defendants are entitled to qualified immunity because the conditions did not violate any clearly established law. (*Id.*).

Regarding the alleged false reports made by Defendants Atkins and Siregar, Defendants argue that Plaintiff's claim fails because there is no evidence that "anything negative happened as a result of the notations in his chart." (*Id.*)

Finally, Defendants contend that Plaintiff's state law claims fail for three reasons. First, Plaintiff did not comply with provisions of the California Tort Claims Act by presenting a claim to the Victim Compensation and Government Claims Board prior to filing this action. (*Id.* at 23–24 (citing Cal. Govt. Code §§ 945.4, 950.2 (West 2009))). Second, Defendants Benson, Bellamy, Monroe, Armas–Carl, and Luna enjoy "discretionary act immunity" pursuant to California Government Code section 820.2. (*Id.* at 24). Third, Plaintiff's claim under California Code of Regulations, title 9, section 884(b)(1) fails because a "denial" of property is not prohibited by the section and because the section does not create a private cause of action. (*Id.* at 25).

## IV.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff argues he should be granted summary judgment on his claims of excessive force, his claim that he was denied his personal property, and his claims related to the Refusal Room conditions. (Plaintiff's MPSJ at 4–14). He also argues that genuine issues of material fact preclude summary judgment on his claim of inadequate medical care. (*Id.* at 2–3).

According to Plaintiff, he is entitled to summary judgment on his excessive force claims under the Fourth Amendment's "objective reasonableness" standard. (*Id.* at 6). He argues that *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), requires examination of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (Plaintiff's MPSJ at 6). Plaintiff asserts that Defendants have failed to produce evidence that Plaintiff had committed or was suspected of committing a crime, was an immediate threat, or resisted arrest. (*Id.* at 6–7). He also asserts that Defendants' alleged motives are irrelevant to the objective reasonableness test and that Defendants' alleged reasons are either "spurious" or unsupported by evidence. (*Id.* at 8–10).

Plaintiff's argument regarding his third claim, which he labels "Punishment," flows from the proposition that those who have not been convicted of a crime, such as those who are civilly committed, cannot be punished. (*Id.* at 10 (citing *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) and *Hydrick v. Hunter,* 500 F.3d 978 (9th Cir.

2007), *vacated on other grounds*, —— U.S. ——, 129 S.Ct. 2431, 174 L.Ed.2d 226 (2009))).[6] Plaintiff asserts that the deprivation of property that occurs when he is locked out of his room while in the Refusal Room constitutes punishment. (Plaintiff's MPSJ at 11). Plaintiff then asserts that the Refusal Room conditions also violate his constitutional rights under the Eighth Amendment's prohibition against cruel and unusual punishment, which provides less protection than the Fourteenth Amendment. (*Id.* at 11–14).

As to his state law tort claims, Plaintiff asserts that he has fulfilled all filing requirements, including the statute of limitations. (*Id.* at 15). He further asserts that he has filed an administrative claim with the "State Personnel Board." (*Id.* at 15). He also asserts that federal courts are not bound by California statutes that impose exhaustion requirements, and that, under federal law, there is no exhaustion requirement for § 1983 claims. (*Id.*).

Finally, he asserts that Defendants are not immune under either the doctrine of qualified immunity, because the constitutional rights allegedly abridged had been clearly established since *Youngberg*, or the doctrine of discretionary act immunity. (*Id.*).

## V.

### DISCUSSION

#### A. *Summary Judgment Standards*

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c)(2); *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir.2007). "When presented with cross-motions for summary judgment, [a court] review[s] each motion for summary judgment separately, giving the nonmoving party for each motion the benefit of all reasonable inferences." *Center for Bio–Ethical Reform, Inc. v. L.A. County Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir.2008). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.

---

**6.** *Hydrick* is the Ninth Circuit's most recent pronouncement on the constitutional rights of civilly committed persons. *See Hydrick*, 500 F.3d at 989–1000 (discussing the constitutional rights of civilly committed persons under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments and the Double Jeopardy and Ex Post Facto Clauses). Thereafter, using its summary Grant/Vacate/Remand ("GVR") procedure the Supreme Court vacated the Ninth Circuit's judgment on a ground unrelated to the constitutional issues. *See Hunter v. Hydrick*, —— U.S. ——, 129 S.Ct. 2431, 174 L.Ed.2d 226 (2009) (vacating and remanding for further consideration in light of *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009)). Arguably, this robs the Ninth Circuit's opinion of its precedential value. However, the Supreme Court has made clear that a GVR order is not a final disposition on the merits, but merely "indicate[s] that, in light of intervening developments, there [is] a reasonable probability that the Court of Appeals [will]

reject a legal premise on which it relied and which may affect the outcome of the litigation." *Tyler v. Cain*, 533 U.S. 656, 665 n. 6, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). Thus, the Ninth Circuit and others have taken the position that a vacated judgment retains precedential authority on those issues not addressed in the order vacating it. *See, e.g., Santos v. Gates*, 287 F.3d 846, 855 n. 11 (9th Cir.2002) (a vacated opinion "remains good law with respect" to an issue not addressed in the order vacating it); *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C.Cir.2006) ("When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding continue[s] to have precedential weight, and in the absence of contrary authority, we do not disturb it." (internal quotation marks omitted)). Thus, the Court will look to *Hydrick* as persuasive, if not binding, authority on the constitutional standards applicable to civilly committed persons.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ A district court may grant summary judgment on the grounds of qualified immunity. In order to evaluate a claim of qualified immunity, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009) (citations omitted). Although courts ideally conduct this analysis sequentially, they may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. Whether a right is clearly established turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 822. "The dispositive inquiry is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Elliot–Park v. Manglona,* 592 F.3d 1003, 1008 (9th Cir.2010) (internal quotation marks omitted).

## B. *Defendants Are Entitled To Summary Judgment On Plaintiff's Inadequate Medical Care Claims*

### 1. Plaintiff's Claims

■ Plaintiff argues that he was provided inadequate medical care because the Mall Treatment program at Patton did not comport with accepted professional standards of care or his rights under a Consent Judgment made applicable to Patton on August 16, 2006. (*See* TAC at 8–9, ¶¶ 25–27; MPSJ at 1; Endsley Decl. at 2, ¶ 3; *see also* Order Amending Consent Judgment at 2). More specifically, he complains that he was required to attend Mall Treatment sessions that did not address his specific treatment needs and that he did not choose. (TAC at 8, ¶ 25). He also argues that the Mall Treatment program at Patton violated the Consent Judgment's requirement that Patton implement a program embodying a "Recovery Philosophy" and "Psychosocial Rehabilitation Model" of care. (*Id.* at 7–8, ¶¶ 13, 20, 23; MPSJ at 1; Endsley Decl. at 2, ¶ 3). Finally, he states that he was unconstitutionally punished when Defendants Benson and Luna revoked his Industrial Therapy assignment and withdrew their permission for Plaintiff to participate in patient government. (TAC at 8, ¶ 23).

### 2. Applicable Law

■ In *Youngberg,* the Supreme Court set out the standard for measuring claims of inadequate medical care by civilly committed persons. Under the rubric of substantive due process, whether a civilly committed person's "constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg,* 457 U.S. at 321, 102 S.Ct. 2452. The Court recognized that the civilly committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22, 102 S.Ct. 2452.

■ The *Youngberg* Court held that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised. It is not appropriate for the courts to specify which of

several professionally acceptable choices should have been made." *Id.* at 321, 102 S.Ct. 2452 (internal quotation marks omitted). "A decision made by a professional is presumptively valid," and courts must show deference to such decisions. *Sharp v. Weston,* 233 F.3d 1166, 1171 (9th Cir. 2000). This presumption can be overcome and " 'liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.' " *Sharp,* 233 F.3d at 1171 (quoting *Youngberg,* 457 U.S. at 323, 102 S.Ct. 2452). That is, courts must allow states "wide latitude in developing treatment regimens" and interfere only "when there is a substantial departure from accepted professional judgment or when there has been no exercise of professional judgment at all." *Sharp,* 233 F.3d at 1171. Thus, "courts must restrict their inquiry to two questions: (1) whether the decisionmaker is a qualified professional entitled to deference, and (2) whether the decision reflects a conscious indifference amounting to gross negligence, so as to demonstrate that the decision was not based on professional judgment." *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992).

### 3. Plaintiff Has Not Raised A Genuine Issue Of Material Fact As To Whether His Medical Care Was Constitutionally Inadequate

Under the standard of *Youngberg,* Plaintiff's claim of inadequate medical care must fail. Defendants have provided declarations confirming that the decision to implement Mall Treatment and the decisions regarding Plaintiff's treatment were taken by qualified professionals in the exercise of their professional judgment. Plaintiff has failed to produce evidence that raises any genuine issue of material fact as to whether professional judgment was, in fact, exercised in the implementation of Mall Treatment at Patton or in the individual treatment decisions applicable to Plaintiff.

There is uncontroverted evidence to show that those who made the decision to implement Mall Treatment at Patton were professionals entitled to deference. According to Defendants' declarations, Patton's Executive Director, Octavio Luna, in consultation with Dr. Nirbhay Singh, a consultant retained by the California Department of Mental Health ("DMH"), and governmental officials from the DMH determined that Mall Treatment was appropriate. (*See* Luna Decl. at 1, ¶ 1; *id.* at 4–5, ¶¶ 7–13). Defendant Luna had been Clinical Administrator at Patton for eleven years, prior to being promoted to Hospital Administrator. (*See id.* at 1, ¶ 1). He was promoted to Acting Executive Director in 2003 and has been Executive Director at Patton since January 2004. (*See id.*). Dr. Singh had previously assisted other public psychiatric hospitals to implement changes in order to ensure the civil rights of their patients, and had acted as Court Monitor in at least one previous lawsuit brought by the United States Department of Justice. (*See id.* at 3, ¶ 7). While Plaintiff asserts that Defendants are not "qualified to give expert testimony" in the fields of "Recovery Philosophy" and the "Psychosocial Rehabilitation Model," at least in part by virtue of their status as Defendants (*see* Plaintiff's MPSJ at 2), he has presented no *evidence* that the decisionmakers are not entitled to the deference due professionals.

Defendants have similarly provided ample evidence that the Mall Treatment program was implemented in the exercise of professional judgment. Dr. Singh recommended to Luna the implementation of "a new model of treatment delivery known as Psychosocial Rehabilitation Mall." (Luna Decl. at 4–5, ¶ 11). As

noted above, the decision to implement Mall Treatment at Patton and other California state psychiatric hospitals "was made collaboratively by various officials from the headquarters of the DMH and the Executive Directors at each hospital." (*Id.* at 5, ¶ 13). Moreover, prior to implementing Mall Treatment at Patton, Patton's Clinical Administrator was sent to examine a hospital in Virginia that had implemented Mall Treatment and she reported that the program "seemed to be working generally well." [7] (*Id.* at 5, ¶ 14).

The evidence also demonstrates that the decisionmakers considered specific advantages of Mall Treatment in deciding to implement it. Mall Treatment utilized staff resource efficiently, allowing staff to interact with patients in groups, thus ensuring that all patients had the opportunity to interact with staff. (*Id.* at 6, ¶ 15). Mall Treatment also added structure to patients' lives, which could help prepare them for release into the community. (*Id.* at 6, ¶ 16). Because patients were not forced to participate in Mall Treatment (*see, e.g., id.* at 7, ¶ 21), staff was able to deal with problems of monitoring patients who refused Mall Treatment by instituting the Refusal Room. A communal gathering place was necessary because, while Mall Treatment groups were in session, there was not enough staff to monitor the patients in their rooms to make sure they were not harming themselves or others or otherwise breaking hospital rules. (Luna Decl. at 7, ¶ 21–22, 30; Bellamy Decl. at 3, ¶¶ 7–8; Loyarte Decl. at 3, ¶ 7; Armas–Carl Decl. at 3, ¶ 6; Birks Decl. at 2–3, ¶ 5; Atkins Decl. at 2, ¶ 5).

Similarly, Defendants present evidence that professionals exercised their professional judgment when they made decisions regarding Plaintiff's individual treatment. In his Motion for Partial Summary Judgment, Plaintiff does not argue that the individuals who were treating him were not professionals entitled to deference. Defendants' evidence shows that the decisions Plaintiff challenges, such as the decision to revoke Plaintiff' Industrial Therapy and patient government assignments, were made by his treatment team. (*See, e.g.,* Luna Decl. at 8, ¶ 26; Benson Decl. at 12, ¶ 34; Marriot Decl. at 11, ¶ 34, Melvin Decl. at 6–8, ¶¶ 20–27). Furthermore, uncontroverted evidence shows that Plaintiff's Industrial Therapy and patient government positions were taken away in exercise of professional judgment. Plaintiff was diagnosed with Narcissistic Personality Disorder, a condition in which a patient has unrealistic beliefs that he is entitled to special treatment and "is unable to realize that [his] own faults or decisions can be responsible for [his] own problems." (Benson Decl. at 2–3, ¶¶ 5–6; *id.*, Exh. 1 at 2; *id.*, Exh. 2; *see also* Melvin Decl. at 3, ¶ 6; Endsley Depo. at 11:5–18). Given this diagnosis, Plaintiff's treatment team decided that allowing Plaintiff the privilege of participating in Industrial Therapy and patient government while he refused to participate in his treatment would be "countertherapeutic" because it would be providing Plaintiff "special treatment." (Luna Decl. at 8, ¶ 26; Benson Decl. at 12, ¶ 34; Marriot Decl. at 11, ¶ 34; Melvin Decl. at 6–8, ¶¶ 20–27). Moreover, it is undisputed that, had Plaintiff agreed to attend Mall Treatment, he could have kept

---

**7.** The Clinical Administrator's out-of-court statement to Defendant Luna is not hearsay, because it is not offered for the truth of the matter asserted (i.e. that the Mall Treatment program in Virginia worked well), but instead for its effect on Luna's subsequent conduct in

implementing Mall Treatment at Patton. *See, e.g., U.S. v. Payne,* 944 F.2d 1458, 1472 (9th Cir.1991) (holding that a statement not offered for truth of the matter asserted but instead to show its effect on the listener was "properly treated as non-hearsay").

the forfeited assignments. (Endsley Depo. at 97:19–25).

To the extent that Plaintiff complains that he was assigned Mall Treatment groups that did not address his specific treatment needs and that he did not choose (TAC at 8, ¶ 25), Defendants have produced evidence to show that these decisions, too, were taken in the exercise of professional judgment. Under the Mall Treatment program, patients and their treatment teams would decide which Mall Treatment groups patients would attend. (Marriot Decl. at 6, ¶ 15; Benson Decl. at 7–8, ¶ 20). The evidence also shows that, when Plaintiff was not completely refusing treatment, he and his treatment team chose the groups he would attend. (Benson Decl. at 8, ¶ 23; Marriot Decl. at 6–7, ¶ 17; Endsley Depo. at 32:23–35:20; *id.* at 36:2–10).

Plaintiff has failed to produce any evidence to controvert these facts. Moreover, to the extent that Plaintiff complains that the Mall Treatment groups to which he was assigned did not address his treatment needs, Defendants produced evidence that even groups that are not specifically targeted at a patient's particular diagnosis can have positive therapeutic effects, such as allowing patients to practice social skills and to become comfortable with adhering to a schedule, both of which help prepare patients for life after release. (Benson Decl. at 9–10, ¶¶ 27, 29; Marriot Decl. at 7, ¶ 19).

■■■ In opposition to Defendants' Motion for Summary Judgment, Plaintiff asserts that the conditions at Patton violate the 2006 Consent Judgment governing California's public psychiatric hospitals. (Plaintiff's MPSJ at 2–3). However, as discussed below, the Consent Judgment does not create a liberty interest that protects Plaintiff. *See infra* Section V.E. Plaintiff's Third Amended Complaint also refers to the Patton Report, a May 2, 2006

report from the Department of Justice to Governor Arnold Schwarzenegger, outlining in general terms deficiencies in conditions and practices at Patton. (Patton Report at 1, 2–3). The Court notes that the Patton Report is not itself capable of creating a protected liberty interest. The Supreme Court has held that "[p]rotected liberty interests may arise from two sources-the Due Process Clause itself and the laws of the States." *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (quotation marks omitted). The Ninth Circuit has held that a consent decree can create a protected liberty interest because a state voluntarily enters into such an agreement, making any right established under it "by any meaningful measure state-created." *Smith v. Sumner,* 994 F.2d 1401, 1406 (9th Cir.1993). However, the Patton Report is neither a state law nor a consent decree. It is, rather, a document created by the Department of Justice in anticipation of potential litigation with the State of California. (*See* Patton Report at 1 (stating that the Patton Report was created in the course of an investigation pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"), which "gives the Department of Justice authority to seek remedies for any pattern and practice of conduct that violates the constitutional and federal statutory rights of persons with mental illness who are served in public institutions")). Thus, it cannot embody a state-created protected liberty interest.

■■■ At most, the Patton Report could provide evidence on the question of whether staff exercised their professional judgment in the implementation of Mall Treatment. However, while pointing out deficiencies in the care and conditions at Patton, the report does not create a factual issue as to Plaintiff's claim of constitution-

ally inadequate medical care. Plaintiff has brought an individual action challenging the adequacy of his specific medical care. The Patton Report does not address the facts of this case, but rather contains generalized assertions regarding Patton's implementation of Mall Treatment.[8] (*See* Patton Report at 7–8). It does not address the question of whether professional judgment was *in fact* exercised in taking the decisions at issue here. Indeed, there is no indication that the conclusions in the Patton Report involved Plaintiff's treatment in any way. Nor does the Patton Report indicate or permit an inference that the implementation and treatment decisions Defendants made regarding Plaintiff's treatment "reflect[ed] a conscious indifference amounting to gross negligence, so as to demonstrate that the decision[s] w[ere] not based on professional judgment." *Houghton*, 965 F.2d at 1536. To survive a motion for summary judgment, the nonmoving party "is required to show specific facts … that present a genuine issue worthy of trial." *Dark v. Curry County*, 451 F.3d 1078, 1082 n. 2 (9th Cir.2006) (internal quotation marks omitted). The Patton Report's assertions are too generalized to preclude summary judgment on this claim.

In sum, Defendants have produced evidence to show that Plaintiff's treatment was provided in the exercise of professional judgment. Plaintiff has failed to raise a general issue of material fact that would preclude the grant of summary judgment on this claim in favor of Defendants.

**4. Even If Plaintiff Had Demonstrated A Constitutional Violation, Defendants Are Entitled to Qualified Immunity Because It Would Not Be Clear To A Reasonable Official That The Treatment Decisions Made Were Unlawful**

█ *Youngberg* established the contours of the right to constitutionally adequate medical care enjoyed by civilly committed persons. However, even if Defendants' actions and omissions fell below this standard, they are still entitled to qualified immunity, because the treatment decisions made were not clearly unlawful. *See Elliot–Park*, 592 F.3d at 1008 ("The dispositive inquiry is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." (internal quotation marks omitted)).

As discussed above, the evidence shows that all of the decisions with regard to Plaintiff's treatment, from the implementation of Mall Treatment to Plaintiff's individual treatment, were in fact taken in the exercise of professional judgment. No reasonable official would have known that such decisions could be deemed unlawful under a standard that requires "conscious indifference amounting to gross negligence." *Houghton*, 965 F.2d at 1536.

---

**8.** Contrary to Defendants assertion, facts contained in the Patton Report are not inadmissible as hearsay. (*See* Defendant's Opposition at 15–16). The Federal Rules of Evidence contain an exception to the prohibition on hearsay for reports of public offices or agencies setting forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). The Department of Justice created the Patton Report pursuant to its authority to investigate under CRIPA. (*See* Patton Report at 1). Defendants have not argued or provided evidence that the Patton Report is somehow untrustworthy. Thus, to the extent that the Patton Report contains facts, they are admissible. Its legal conclusions, on the other hand, are not. *See, e.g., Wicker v. Oregon ex rel. Bureau of Labor*, 543 F.3d 1168, 1177–78 (9th Cir.2008) (affirming district court's ruling that legal conclusions contained in an affidavit were inadmissible).

### C. Defendants Are Entitled To Summary Judgment On Plaintiff's Excessive Force Claims

#### 1. Plaintiff's Claims

■ As noted above, Plaintiff alleges that on seven occasions various Defendants used excessive force on him in violation of the Fourteenth Amendment:

(1) On December 10, 2004, Defendant Monroe pulled or attempted to pull a chair out from under Plaintiff when Plaintiff refused to sit up from a reclining position while in the Refusal Room. (TAC at 10, ¶ 34; Plaintiff's SUF at 3, ¶ 11);

(2) On January 21, 2005, Defendant Armas–Carl threatened Plaintiff and "called for a show of force" when Plaintiff refused to exit a seclusion room and go to Mall or the Refusal Room (TAC at 10, ¶ 35; Plaintiff's SUF at 3, ¶ 12);

(3) On July 6, 2005, after Plaintiff refused to go to Mall or the Refusal Room, Defendant Bellamy and another employee dragged Plaintiff out of bed, restrained his arms, and dragged him to a seclusion room (TAC at 10, ¶ 36; Plaintiff's SUF at 1, ¶ 3);

(4) On July 8, 2005, after Plaintiff refused to go to Mall or the Refusal Room, hospital employees dragged Plaintiff out of bed, restrained his arms, and dragged him to a seclusion room (TAC at 10–11, ¶ 37; Plaintiff's SUF at ¶ 12);

(5) On July 21, 2005, after Plaintiff refused to go to Mall or the Refusal Room, Defendant Bellamy and two other hospital employees "hoisted [Plaintiff] by his arms and shorts in such a way as to cause intentional infliction of pain of his genitals" and dragged him past other patients and hospital employees (TAC at 11, ¶ 38; see also Plaintiff's SUF at 2, ¶ 5);

(6) On July 22, 2005, after Plaintiff refused to go to Mall or the Refusal Room, Defendant Bellamy and another hospital employee dragged Plaintiff from his bed and carried him toward the Refusal Room, then dropped Plaintiff to the floor when he resisted (TAC at 11, ¶ 39; Plaintiff's SUF at 2, ¶ 6);

(7) On July 25, 2005, after Plaintiff refused to go to Mall or the Refusal Room, Defendant Bellamy and two other hospital employees dragged Plaintiff from his bed with his arms restrained, shoved him into a wall and pushed him to the ground when he resisted, put him in five-point restraints and sedated him, and falsified a report to justify the incident (TAC at 11, ¶ 40; Plaintiff's SUF at 2, ¶ 7).

#### 2. Applicable Law

■ Plaintiff asserts that his excessive force claims should be analyzed under the Fourth Amendment's "objective reasonableness" standard. (Plaintiff's MPSJ at 5). Defendants disagree, insisting that excessive force claims by civil detainees are governed by the Fourteenth Amendment. (Defendants' Opposition at 10). In the Ninth Circuit, the standard for excessive force claims is derived from the Fourth Amendment whether the claim is brought under the Fourth or the Fourteenth Amendments. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir.2002) ("[W]e have determined that the Fourth Amendment sets the applicable constitutional limitations for considering the claims of excessive force during pretrial detention." (internal quotation marks omitted)). The standard is one of objective reasonableness under all of the circumstances.[9]

---

9. Plaintiff asserts that, pursuant to *Graham v.* *Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865,

*See Gibson,* 290 F.3d at 1197–98 (discussing *Graham* ); *see also Hydrick,* 500 F.3d at 997–98 (stating that an objective reasonableness standard applies to excessive force claims by persons who are involuntarily civilly committed).

░░░░░░ In evaluating an excessive force claim, the court must determine whether the use of force was reasonable "in light of the facts and circumstances confronting the [state actor], from the perspective of a reasonable [state actor] at the scene, rather than with the 20/20 vision of hindsight." *Long v. City & County of Honolulu,* 511 F.3d 901, 906 (9th Cir.2007) (internal quotation marks omitted). The Eighth Amendment "provides a floor for the level of protection" due civilly confined persons, and, because its "contours . . . are more defined [than the contours of the Fourteenth Amendment], Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied." *Hydrick,* 500 F.3d at 998. The Eighth Amendment prohibits "unnecessary and wanton force . . . [and] takes into account such facts as the need for the application of force, the relationship between the need and the amount of force used, the threat perceived by the officer, any effort to temper the severity of the forceful response, . . . the extent of the injury inflicted,[10] and whether the force was applied for a legitimate purpose." *Id.*

░░░░░ In *Hydrick,* the Ninth Circuit, looking to Supreme Court precedent, "restate[d] the contours" of the law applicable to excessive force claims by the civilly committed: "The Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, within the bounds of professional discretion." *Hydrick,* 500 F.3d at 997 (citing *Bell,* 441 U.S. at 536, 99 S.Ct. 1861; *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. 2452; and *Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001)) (internal citations, quotation marks, and brackets omitted). There is "a *de minimis* level of imposition with which the Constitution is not concerned." *Bell,* 441 U.S. at 539, n. 21, 99 S.Ct. 1861 (internal quotation marks omitted). Moreover, if a particular condition or restriction is "reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539, 99 S.Ct. 1861. "Legitimate nonpunitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'" *Pierce v. County of Orange,* 526 F.3d 1190, 1205 (9th Cir.2008) (quoting *Bell,* 441 U.S. at 540 n. 23, 99 S.Ct. 1861).

░░░░ In defending institutional policies, however, officials "cannot rely on general or conclusory assertions." *Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990).

---

104 L.Ed.2d 443 (1989), the Court must evaluate excessive force claims by examining "the severity of the crime at issue, . . . whether the suspect poses an immediate threat to the safety of the officers or others, and . . . whether he is actively resisting arrest or attempting to evade arrest by flight." (Plaintiff's MPSJ at 6 (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865)). However, in the context of detention rather than arrest some of these factors will likely not be relevant. *See Gibson,* 290 F.3d at 1197 n. 21.

**10.** The Supreme Court recently clarified that "the core judicial inquiry" in Eighth Amend-

ment excessive force cases is not "whether a certain quantum of injury is sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* —— U.S. ——, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010). However, the Court reiterated that the extent of injury can be relevant to whether the use of force was necessary. *Id.* Furthermore, if the force applied was *de minimis,* it fails to give rise to a federal cause of action. *Id.*

Instead, "they must first identify the specific [governmental] interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point." *Id.*

### 3. There Is No Genuine Issue Of Material Fact As To Whether Plaintiff Was Subjected to Constitutionally Excessive Force

Defendants are entitled to summary judgment on Plaintiff's excessive force claims because in each of the incidents, the force used was reasonable under all of the circumstances and did not amount to punishment.

#### a. The December 10, 2004 Incident

The December 10, 2004 incident, in which Defendant Monroe pulled or attempted to pull a chair out from under Plaintiff when Plaintiff refused to sit up from a reclining position while in the Refusal Room, does not constitute excessive force as a matter of law. Plaintiff asserts that Defendant Monroe merely slowly tipped forward a chair on which Plaintiff had laid his head and shoulders until Plaintiff sat up. (Endsley Depo. at 128:10–129:10). Plaintiff was not injured. (*Id.* at 129: 11–13). This is just the sort of *"de minimis . . .* imposition with which the Constitution is not concerned." *Bell,* 441 U.S. at 539, n. 21, 99 S.Ct. 1861 (internal quotation marks omitted). Even if this intrusion were more than *de minimis,* Defendants produced evidence that Defendant Monroe was attempting to enforce a rule prohibiting sleeping in the Refusal Room. (Luna Decl. at 7–8, ¶ 24; *see also* Endsley Depo. at 129:23–25). Sleepiness was a matter of concern because it could be caused by "an adverse reaction to medication [or] the after-effects of an altercation," either of which threaten the patient's

safety and security. (Luna Decl. at 7–8, ¶ 24). Thus, the moderate amount of force used to waken Plaintiff in the Refusal Room was rationally related to a legitimate governmental purpose and did not constitute excessive force. *See Pierce,* 526 F.3d at 1205 (maintaining security and order is a legitimate nonpunitive governmental objective).

#### b. The Remaining Incidents

Plaintiff's refusal to attend either Mall Treatment or the Refusal Room provoked the remaining six incidents. (*See* Plaintiff's SUF at 1–2, ¶¶ 3–7; *id.* at 3, ¶ 12). That is, the allegedly excessive force occurred when Defendants or other Patton staffers were attempting to remove a resisting Plaintiff from his room or a seclusion room during Mall Treatment hours. Defendants' uncontroverted evidence shows that the Refusal Room allowed staff to efficiently monitor patients who refused Mall Treatment to make sure they were not harming themselves or others or otherwise breaking hospital rules. (Luna Decl. at 7, ¶¶ 21–22, 30; Bellamy Decl. at 3, ¶¶ 7–8; Loyarte Decl. at 3, ¶ 7; Armas–Carl Decl. at 3, ¶ 6; Birks Decl. at 2–3, ¶ 5; Atkins Decl. at 2, ¶ 5). Thus, Defendants have established (and Plaintiff has not rebutted) that the rule requiring patients who refused Mall Treatment to attend the Refusal Room was instituted to maintain security and order in the institution. With this background established, the Court turns to Plaintiff's remaining claims of excessive force.

#### (1) The January 21, 2005 Incident

Plaintiff complains that on January 21, 2005, Defendant Armas–Carl called for a show of force to remove Plaintiff from a seclusion room when he refused to attend Mall Treatment or go to the Refusal Room. According to Plaintiff, Defendant

Armas–Carl called in an emergency on her walkie-talkie and, within a few minutes, between five and eight staff members "came rushing towards [Plaintiff]." (Endsley Depo. at 100:10–13). Prior to any physical contact, Plaintiff "complied and went to the Refusal Room." (*Id.* at 100:14–16). The Ninth Circuit has held that "mere threats" do not state a cognizable claim under § 1983. *Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987).

The threat of force here was applied in furtherance of a rule instituted for the maintenance of security and order. Plaintiff was neither touched nor injured. There was no constitutional violation under the objective reasonableness standard. *Cf. Robinson v. Solano County,* 278 F.3d 1007, 1013–15 (9th Cir.2002) (en banc) (holding that the allegation that police officers' "use of a drawn gun pointed at close range at [plaintiff's] head" stated a claim for excessive force in the absence of any touching when no factors justifying force were present); *see also id.* at 1017 (Fernandez, J. concurring in the judgment) ("In my view, when the seizure itself is otherwise proper the mere threat of force cannot be an excessive force within the meaning of the Fourth Amendment.").

### (2) The July 6, 2005 and July 8, 2005 Incidents

The July 6, 2005 and July 8, 2005 incidents are sufficiently similar to be analyzed together. (*See* Endsley Depo. at 147:2–9 (stating that the July 8 incident was similar to the July 6 incident)). In each of these incidents, Plaintiff purposely went limp as staff members pulled him to a seated position on his bed, restrained his arms behind his back and stood him up. (*See id.* at 139:12–140:10). Staff members then walked him down the hall. (*See id.* at 140:12–14; 147:5–9). Plaintiff walked under his own power. (*See id.* at 139:2–4; 141:1–6; 147:13–15). Plaintiff admits that staff members did not use any more force than was required to move Plaintiff out of his room. Regarding the July 6 incident, Plaintiff stated that staff "did not use any more force than was called for for [sic] the purpose of moving me out of the room." (*Id.* at 160:13–17). Regarding the July 8 incident, Plaintiff responded that he "d[idn't] believe" that staff used "more force ... than was needed to move [him] from [his] room." (*Id.* at 161:1–4). He further admits that he was not injured. (*Id.* at 112:21–113:17; 144:4–6).

Thus, Plaintiff's own admissions establish that Plaintiff resisted leaving his room, requiring the use of force; Defendants did not use more force than was necessary to effectuate this goal; and Plaintiff was not injured. Moreover, Plaintiff was moved because of a policy prohibiting patients from staying in their rooms during Mall Treatment hours because of security concerns. The force applied in these incidents did not violate the Constitution.

### (3) The July 21, 2005 Incident

According to Plaintiff, in the July 21 incident, one staff member held each of his arms and a third staff member "lift[ed] [Plaintiff] from [his] shorts because [he] was completely limp at the time." (*Id.* at 165:9–16). This caused pain to his genitals. (Plaintiff's SUF at 2, ¶ 5). Plaintiff asserts that his feet and toes were stepped on. (Endsley Depo. at 165:19–20; Plaintiff's SUF at 2, ¶ 5). Plaintiff states he was "completely limp" because he "wasn't going to make it easy for them to take him" to the Refusal Room. (*Id.* at 166:1–8). He admits that he was not intentionally hurt, there was no lasting pain, and there was no injury. (*Id.* at 112:21–113:17; 166:12–21). Plaintiff admits that staff did not use more force than was needed to carry him. (*Id.* at 166:22–24).

Again, Plaintiff's own admissions establish that there was no excessive force. Plaintiff refused to leave his room. He

resisted by going limp, forcing Defendants to carry him from his room to the Refusal Room. This was pursuant to a rule intended to provide security for patients and staff. He was not injured, and Defendants used only the force necessary to effectuate the rule.

#### (4) The July 22, 2005 Incident

On July 22, 2005, after Plaintiff refused to leave his room he was led away with his arms restrained behind his back in a manner that caused him pain. (*Id.* at 167:4–168:10). When he complained of the pain and received no response, Plaintiff went limp, which caused Defendants to drop him on the floor. (*Id.* at 167:18–24; 168:19–169:9). Plaintiff asserts he was not dropped intentionally. (*Id.* at 169:8–12). Plaintiff was not injured and suffered no lasting pain after the incident. (*Id.* at 112:21–113:17; 168:13–15). As above, the modest force used on Plaintiff was necessitated by his resistance to a legitimate rule providing for institutional security. Plaintiff admits that he caused staff members to drop him by "going limp." Plaintiff was not injured. The use of force was reasonable.

#### (5) The July 25, 2005 Incident

 On July 25, 2005, Defendant Bellamy and two other hospital employees pulled Plaintiff from a prone position in his bed to a seated position and then to a standing position. (*Id.* at 171:9–172:6). Plaintiff's hands were behind his back. (*Id.* at 172:7–8). Plaintiff complained of pain, "resisted being moved," and "tried to pull away from them" by "twisting." (*Id.*

at 172:11–18; 174:6–8). In response, the staff members pushed him against a wall and began dragging him down the hallway. (*Id.* at 172:19–20). Plaintiff did not go willingly and continued resisting, "again attempt[ing] to twist and get out of their grasp." (*Id.* at 172:20–173:3; 177:25–178:1). Although Plaintiff asserts he did not swing at anyone (*id.* at 175:1–3; 179:6–7), he admits that "it could be construed [he] was trying to pull [his] arm out of their grasp," and that "they could have interpreted it as a swing" (*id.* at 174:23–25; 175:6–12). In the face of this further resistance, the staff members pushed Plaintiff to the ground on his stomach and reported an emergency. (*Id.* at 173:4–6; 179:3–6; 179:10–12). More staff members arrived, and Plaintiff was put on a gurney and placed in five-point restraints. (*Id.* at 173:6–8; 173:16–18; 180:11–23). He was then sedated. (*Id.* at 173:18–20; *see also* Plaintiff's SUF at 2, ¶ 7).

 Although the force used in this incident was greater than that used in any of the previous incidents, it still was not constitutionally excessive. Plaintiff admits to continually resisting. He admits that the staff could reasonably have believed he swung at them. He admits that the staff did not intend to hurt him. (*Id.* at 171:25–172:2). He admits that the staff used no more force than was necessary to gain control of him. (*Id.* at 176:21–177:2; 180:6–10). He admits the staff did not injure him. (*Id.* at 112:21–113:17; 180:6–7). Under these circumstances, it is clear that the force used was reasonably necessary to restore security and order.[11]

---

**11.** Plaintiff claims that, as a result of this incident, Defendants Atkins and Siregar falsely reported in his medical records that Plaintiff "swung" at them. (TAC at 11; Endsley Depo. 175:3–5). To the extent Plaintiff attempts to argue that these notations violate his constitutional rights, he fails. First, the uncontroverted evidence does not support Plaintiff's assertion that the notations were

false. Rather, Plaintiff admits that his actions could have been interpreted as a swing. (*Id.* at 175:11–12). Second, he has not asserted that the allegedly false notations had any negative consequences. (*Id.* at 181:12–22). Thus, he did not suffer any "deprivation." *See* U.S. Const., amend. XIV (prohibiting deprivations of life, liberty, or property without due process of law).

Thus, Plaintiff has failed to demonstrate that he is entitled to judgment as a matter of law on his excessive force claims. Defendants, however, have shown that there is no genuine issue of material fact that would preclude granting summary judgment in their favor on these claims.

### 4. Even If Defendants Monroe, Armas–Carl, And Bellamy Applied Constitutionally Excessive Force, They Are Entitled To Qualified Immunity Because It Was Not Clear That Their Actions Violated Clearly Established Law

As noted above, the Ninth Circuit recognized in *Hydrick* that the contours of the Fourteenth Amendment's protections against excessive force were ill-defined, and that the Eighth Amendment provided a "floor for the level of protection" that civil committees must be provided. *Hydrick*, 500 F.3d at 998. For the purposes of qualified immunity analysis, then, the Eighth Amendment provides the "clearly established" contours of protection against excessive force. *Id.* at 988 ("[T]he rights afforded prisoners set a floor for those that must be afforded [civilly-committed persons], and ... where the [d]efendants violate a standard that is clearly established in the prison context, the violation is clearly established [in the context of the civilly committed]."). The Eighth Amendment prohibits only "unnecessary and wanton force." *Id.* at 998. " '[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir.2003) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

In each of the incidents discussed above, staff members attempted, through the use of physical force or threat of force exerted on Plaintiff or on furniture on which he was reclining, to cause Plaintiff to obey the rules of the institution. In every case, this physical force or threat of force was motivated by Plaintiff's resistance. Plaintiff was not injured. In four of the five incidents in which physical force was actually used on him, Plaintiff admits that the staff members used no more force than was necessary to move him. Under these circumstances, it would not be clear to a reasonable psychiatric hospital staff member that his actions were unlawful under the Eighth Amendment standard prohibiting the application of force maliciously and sadistically for the very purpose of causing harm. Accordingly, Defendants are entitled to qualified immunity.

### D. Defendants Are Entitled To Summary Judgment On Plaintiff's Conditions Of Confinement Claims

#### 1. Plaintiff's Claims

Plaintiff claims that the Refusal Room conditions amounted to punishment. He claims that Defendants intentionally and maliciously overcrowded the room. (Plaintiff's SUF at 3, ¶ 14; *see also* TAC at 14, ¶¶ 55–58). He further asserts that the conditions were unsanitary, asserting that the floors were grimy and the walls had "dried phlegm or mucus" on them. (Plaintiff's SUF at 3, ¶ 14; *see also* TAC at 14, ¶¶ 55–58). Plaintiff also asserts that, on two occasions, he and other patients were forced to watch a video "repeated over and over" (Plaintiff's SUF at 3, ¶ 15; *see also* TAC at 14, ¶¶ 56, 58). He alleges that Defendant Birks twice "rang a radio" in his ear while he tried to sleep in the Refusal Room. (TAC at 14, ¶ 59; Plaintiff's SUF at 3, ¶ 16). Finally, he claims that he was deprived of his property while in the Refusal Room because under hospital policy patients' rooms were locked during Mall

Treatment hours. (TAC at 14, ¶¶ 53, 62, 63; Plaintiff's SUF at 3, ¶ 13).

### 2. Applicable Law

As noted above, the Fourteenth Amendment, rather than the less protective Eighth Amendment, applies to challenges to conditions of confinement brought by civilly committed persons. *See Jones v. Blanas,* 393 F.3d 918, 931 (9th Cir.2004) (recognizing that detainees who have not been convicted are entitled to a "more protective fourteenth amendment standard"); *see also Hydrick,* 500 F.3d at 998. Under the Fourteenth Amendment, a civilly-committed person may be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution." *Bell,* 441 U.S. at 536–37, 99 S.Ct. 1861.

 "For a particular government action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Demery v. Arpaio,* 378 F.3d 1020, 1030 (2004). For a "harm or disability" to be cognizable under the constitution, it "must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Id.* In the Ninth Circuit, the second prong of the test can be demonstrated by showing that the conditions are "expressly intended to punish" or that the conditions serve a nonpunitive purpose but are excessive in relation to that purpose. *Jones,* 393 F.3d at 932. As noted above, "[l]egitimate nonpunitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'" *Pierce,* 526 F.3d at 1205. Because the Fourteenth Amendment standard is "amorphous," courts may look for guidance to cases analyzing conditions of

confinement under the Eighth Amendment. *See, e.g., Conn v. City of Reno,* 591 F.3d 1081, 1094 & n. 3 (9th Cir.2009) (as amended); *Hydrick,* 500 F.3d at 998. Under the Eighth Amendment, conditions of confinement constitute cruel and unusual punishment if a person is "deprived of the minimum civilized measure of life's necessities" and a state actor "acted with deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.1998).

### 3. There Is No Genuine Issue Of Material Fact As To Whether Plaintiff's Conditions Of Confinement Violate The Constitution

The conditions at Patton about which Plaintiff complains neither amount to punishment nor otherwise violate the Constitution.

#### a. Alleged Crowding In The Refusal Room

Plaintiff asserts that at times patients in the Refusal Room were "so compacted together as to be shoulder-to-shoulder." (Endsley Decl. at 3, ¶ 11). However, Plaintiff's assertions of overcrowding do not rise to the level of a harm or disability with which the Constitution is concerned. *See Bell,* 441 U.S. at 539 n. 21, 99 S.Ct. 1861 ("There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.") (internal quotation marks omitted). As the Supreme Court noted in *Bell,* some crowding and loss of freedom of movement is one of the inherent discomforts of confinement. *Bell,* 441 U.S. at 536, 542, 99 S.Ct. 1861; *see also Demery,* 378 F.3d at 1030 (noting that *Bell* determined that "the additional discomfort of having to share the already close corners with another detainee was not sufficiently great to constitute punishment"). Moreover, the alleged overcrowding in the Refusal Room was a condition to

which Plaintiff was exposed for at most four hours per day, and only when he refused to attend Mall Treatment. (*See, e.g.,* Benson Decl. at 7, ¶ 19) (explaining that Mall Treatment occurred for two hours in the morning and two hours in the afternoon); *id.* at 8–9, ¶ 23 (stating that patients refusing Mall Treatment were required to go to the Refusal Room during Mall Treatment hours). In *Bell,* the Supreme Court held that crowding was not a constitutional violation in part because "[d]etainees are required to spend only seven or eight hours of each day in their rooms .... During the remainder of the time, the detainees are free to move between their rooms and the common area." *Bell,* 441 U.S. at 543, 99 S.Ct. 1861; *see also Delgado v. Cady,* 576 F.Supp. 1446, 1456 (E.D.Wisc.1983) ("As a temporary response to a situation created by the inmates own actions, ... [triple celling] does not constitute a constitutional violation.").

 Even if the crowding were to constitute more than a *de minimis* harm, there is no evidence that the condition was intended to punish or was excessive in relation to a non-punitive purpose. *Jones,* 393 F.3d at 932. Plaintiff offers only a bare allegation that unnamed staff members intentionally overcrowded the Refusal Room to "annoy" patients. (Plaintiff's MPSJ at 14). This bare allegation neither supports Plaintiff's motion for summary judgment nor creates a genuine issue of material fact on the issue of punitive intent. *See Nelson v. Pima Cmty. College,* 83 F.3d 1075, 1081–82 (9th Cir.1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Nor is there any evidence that the crowding in the Refusal Room was excessive in relation to a non-punitive purpose. Rather, the uncontroverted evidence demonstrates that the rule requiring patients to be present in the Refusal Room during Mall Treatment hours was implemented to maintain securi-ty and order in the institution. (*See* Section V.C. 3, *supra* ). Mall Treatment required the use of many rooms. Locating rooms to use for treatment was difficult because of a lack of unused space. (Armas–Carl Decl. at 2–3, ¶ 5; Loyarte Decl. at 3, ¶ 6). Issues regarding space also constrained the options for location of the Refusal Room. (Armas–Carl Decl. at 3, ¶ 7). Thus, to the extent that the Refusal Room was small for the number of patients it accommodated, this was necessitated by the physical constraints of the hospital. There is no genuine issue of material fact as to whether crowded conditions in the Refusal Room constituted punishment in violation of the Constitution. *See Bell,* 441 U.S. at 540, 99 S.Ct. 1861 ("The government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational necessities may require administrative measures that go beyond those that are, strictly speaking, necessary [to secure the objective of the detention].").

#### b. Sanitation In The Refusal Room

 Plaintiff asserts that the floor of the Refusal Room was grimy; that the walls were stained with phlegm or mucus; and that on occasion he was confined while ill or with other patients who were "sick with a cold or flu." (*See* Endsley Depo. 182:4–8). The conditions complained about do not rise to the level of a constitutional violation. In *Sain v. Wood,* 512 F.3d 886 (7th Cir.2008), the Seventh Circuit addressed a civilly-committed person's complaints of unsanitary conditions in his cell. The plaintiff complained that "paint was chipping off the walls;" "outdated plumbing emitted a foul odor;" a lack of air conditioning caused the cell to become very hot in the summer, opening windows "allowed bees, wasps and spiders" into the cell; and "[e]ven in the winter, [the] cell

was infested with roaches." *Id.* at 888–89. The court concluded that those conditions were not "objectively serious enough to establish a constitutional violation." *Id.* at 894. The conditions Plaintiff complains of here are significantly less unpleasant than those that the *Sain* court found did not violate the Constitution. Likewise, Plaintiff's claim that being confined in close quarters while sick or with other sick patients violates the Constitution fails. Not only is this claim "not objectively serious," it does not "significantly exceed ... the inherent discomforts of confinement." *Demery*, 378 F.3d at 1030. Indeed, it does not even exceed the discomforts regularly endured by those who are not detained, but live or work in close proximity with others. *See Jordan v. N.J. Dep't of Corr.*, 881 F.Supp. 947, 954–55 (D.N.J.1995) (dismissing a conditions of confinement claim when the allegations "applie[d] to an apartment building as readily as [they] applie[d] to a prison").

### c. Allegedly Excessive Noise

 According to Plaintiff, on two occasions he was subject to the repetition of a video in the Refusal Room and on one occasion Defendant Birks rang a radio in his ear twice. These complaints suffer from the same deficiencies as the crowding and sanitation claims. These are *de minimis* irritations undeserving of notice under the Constitution.

 Plaintiff cites *Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), for the proposition that "excessive noise" can violate the Constitution. (Plaintiff's MPSJ at 13). While Plaintiff is correct that excessive noise in a state-run detention facility can violate the Constitution, *Toussaint* makes clear that Plaintiff's allegations and evidence do not make out such a violation.

In *Toussaint*, the Ninth Circuit affirmed the district court's remedy to alleviate an unconstitutional level of noise at San Quentin and Folsom State Prisons. 801 F.2d at 1085, 1110. The district court described the noise as an "unrelenting, nerve-racking din" and a "constant racket" that "reverberates freely, magnifying noises of all kinds." *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1397 (N.D.Cal.1984), *rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir.1986). The "typical average daytime sound level is in the range of 70 to 75dBa," which was compared to "a noisy vacuum cleaner" or "a freight train at a distance of about 100 feet." *Id.* "After midnight, dBa levels drop[ped], reaching an average low in the range of 60 dBa between 5 and 6 o'clock a.m. This compares with a noisy office." *Id.* Similarly, a district court found excessive noise violated the constitutional rights of pretrial detainees when "the average noise level remain[ed] constantly louder than a ringing alarm clock at a distance of two feet from the listener." *Jones v. City & County of San Francisco*, 976 F.Supp. 896, 915 (N.D.Cal.1997); *see also Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir.1996) (holding that allegations "that at all times of day and night inmates were screaming, wailing, crying, singing and yelling, often in groups, and that there was a constant, loud banging" precluded summary judgment against the plaintiff). These cases make clear that constant, intense noise violates the Constitution. The infrequent, mild noise that Plaintiff identifies does not.

 Moreover, even if Plaintiff's claim was objectively serious enough to violate the Constitution, the uncontroverted evidence shows that the noise was neither intended to punish nor excessive in relation to a nonpunitive purpose. Plaintiff's bare allegation that Defendant Birks acted "for the express purpose of aggravating

[P]laintiff and preventing him from sleeping" does not support Plaintiff's motion for summary judgment or create a genuine issue of material fact on the issue of punitive intent. *See Nelson,* 83 F.3d at 1081–82 ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *(see also* Endsley Decl. at 3, ¶ 14; TAC at 14, ¶ 59). Rather, it undermines his claim because, to the extent that Birks was preventing Plaintiff from sleeping, he was enforcing a rule implemented for the patients' safety.[12] *(See* Luna Decl. at 7–8, ¶ 24; *see also* Birks Decl. at 4, ¶ 10) ("I became concerned about Endlsey's medical status. He was slumped in the chair, and I could not see his face.... I went over to Endsley and asked him if he was okay. Endsley did not respond."). There is no evidence that the repetition of a video on two occasions was intended to punish or was excessive in relation to a nonpunitive purpose. Plaintiff's claim fails.

#### d. Alleged Deprivation Of Property

 Finally, Plaintiff complains that he was deprived of the use of his property during Mall Treatment hours because he was not allowed access to his room. This, he asserts, constituted a violation of the Fourteenth Amendment. (Plaintiff's MPSJ at 11). This appears to be a procedural due process claim, rather than a substantive due process claim *(see, e.g., Stone v. Godbehere,* 894 F.2d 1131, 1134 (9th Cir.1990)) and so it differs in some respects from the claimed violations of substantive due process discussed above.

 The Fourteenth Amendment prohibits the taking of property without due process of law. U.S. Const., amend. XIV. "[D]ue process mandates some form of notice and hearing in order to deprive a property interest that is more than de

minimis." *Id.* However, Plaintiff alleges a deprivation which is, at most, *de minimis. See Sniadach v. Family Finance Corp.,* 395 U.S. 337, 342, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (Harlan, J. concurring) (stating that a *de minimis* taking of property does not require "notice and a prior hearing").

Plaintiff was deprived of the use of his property for, at most, four hours per day during which Mall Treatment groups were in session. (TAC at 14, ¶ 53; Plaintiff's MPSJ at 10–11; Benson Decl. at 7, ¶ 19). This temporary restriction on the use of certain property is not significant enough to be cognizable under the Constitution. *See, e.g., Webster v. Chevalier,* 834 F.Supp. 628, 631 (W.D.N.Y.1993) (holding the temporary deprivation of the use of a portion of inmate wages is "of a *de minimis* nature"); *Falter v. Veteran's Admin.,* 632 F.Supp. 196, 211–12 (D.N.J.1986) (holding the temporary deprivation of patient's clothing for a few days "reflects at most a de minimis level of imposition" (internal quotation marks omitted)).

 Moreover, even if the deprivation were not *de minimis,* there are limitations on a detainee's rights as a consequence of his detention.

> "[T]he fact that [detainees] retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed .... In sum, there must be a mutual accommodation between institutional needs and objectives and the provisions of the constitution that are of general application."

*Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Here, the deprivation during Mall Treatment hours is a consequence of the safety and

---

**12.** Defendant Birks denies both that he rang a radio in Plaintiff's ear and that he used the radio to awaken Plaintiff. (Birks Decl. at 4, ¶¶ 11–12, 14).

security concerns motivating the requirement that patients congregate in the Refusal Room if they balk at Mall Treatment. Thus, it is rationally related to a "[l]egitimate nonpunitive governmental objective [ ]." *Pierce,* 526 F.3d at 1205.

 In addition, Plaintiff claims that the temporary deprivation violates a state-created protected liberty interest derived from a state regulation when he asserts, "[P]laintiff's procedural due process protection from deprivation of property, under [the] [f]ederal Constitution, is defined by [California Code of Regulations, title 9, section 884]." (Plaintiff's MPSJ at 11). This regulation states, in relevant part, that patients in the state's mental health facilities have "[a] right to keep and use personal possessions, except items and materials that are listed as contraband by the facility." Cal. Code. Regs., title 9, § 884(b)(1). This right is subject to denial for good cause, which requires a determination by the director of the institution that exercise of the right would injure the patient, other patients, or the institution, and a notation in the patient's treatment record. *See id.* at § 884(c), (e).

 A state law or regulation may create a liberty interest "by placing substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). "[T]he most common manner in which a State creates a liberty interest is by establishing substantive predicates to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have

been met." [13] *Thompson,* 490 U.S. at 462, 109 S.Ct. 1904; *see also* Section V.E, *infra.*

Assuming without deciding that the regulation creates a protected liberty interest, Plaintiff is still not entitled to relief, because he has not shown that his rights under the regulation were violated. As noted above, Plaintiff complains of a temporary, *de minimis* "deprivation" that occurred during the few hours that Mall Treatment groups were in session. The only way that this could violate his rights under the regulation is if the regulation were interpreted to require constant, unfettered access to all of a patient's belongings unless the director of the institution made a specific finding and the incident was officially recorded. Under this interpretation, if there were a fire (or even fire drill) requiring patients to exit their rooms, the director of the institution would need to make individualized findings and record them in each patient's chart in order to comport with the regulation. The Court refuses to approve an expansive interpretation of the regulation that would lead to so absurd a result. *See, e.g., Ventress v. Japan Airlines,* 486 F.3d 1111, 1117 (9th Cir.2007) (refusing an expansive interpretation when such interpretation would lead to absurd results).[14]

### e. Least Restrictive Conditions

 Defendants argue that Plaintiff has no right to the least restrictive conditions of confinement, noting that Plaintiff appeared to have raised this theory in his Third Amended Complaint by citing California Code of Regulations, title 9, section 883(b)(2), which provides most patients in

---

**13.** The Supreme Court has since abrogated the use of this methodology for internal prison regulations affecting convicted prisoners. *See Sandin v. Conner,* 515 U.S. 472, 484–85, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). However, *Sandin's* analysis does not apply to those who have not been convicted of a crime, such as pretrial detainees and the civilly com-

mitted. *See Valdez v. Rosenbaum,* 302 F.3d 1039, 1044 n. 3 (9th Cir.2002).

**14.** To the extent that Plaintiff argues that Defendants should be liable for enforcing an unconstitutional rule (*see* Defendants' MSJ at 21), the claim fails for the reasons given in this subsection.

state-run psychiatric hospitals "[a] right to receive treatment for a diagnosed mental disorder that is provided in a method least restrictive of individual liberty." (Defendants' MSJ at 16–17). Plaintiff does not respond to this argument in his opposition to Defendants' Motion for Summary Judgment. He has therefore abandoned claim. *See Jenkins v. County of Riverside,* 398 F.3d 1093, 1095 n. 4 (9th Cir.2005) ("[P]laintiff abandoned ... two claims by not raising them in opposition to [defendant's] motion for summary judgment."); *see also Shakur v. Schriro,* 514 F.3d 878, 892 (9th Cir.2008) (noting abandonment of claims in a *pro se* civil rights case).

 Even if Plaintiff had not abandoned the claim, however, it would fail. "[T]he Constitution does not compel states to follow their own laws." *Allison v. Snyder,* 332 F.3d 1076, 1078 (7th Cir.2003) (citing, *inter alia, DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Thus, courts have rejected § 1983 claims seeking to enforce a state-law "least restrictive environment" standard. *See Allison,* 332 F.3d at 1078–79; *P.C. v. McLaughlin,* 913 F.2d 1033, 1044–45 (2d Cir.1990). Following these decisions, the Court rejects this claim.

Plaintiff is not entitled to summary judgment on his conditions of confinement claim. Rather, the Defendants have shown that there is no genuine issue of material fact on this issue and they are entitled to judgment as a matter of law.

**4. Even If There Were A Constitutional Violation, Defendants Would Be Entitled To Qualified Immunity Because It Would Not Be Clear That The Conditions Of Confinement Violated Clearly Established Law**

 As recently as 2009, the Ninth Circuit noted that because the Fourteenth Amendment standard is "amorphous" the Eighth Amendment provides guidance regarding when conditions of civil confinement will be considered punishment. *See, e.g., Conn,* 591 F.3d at 1094 & n. 3; *Hydrick,* 500 F.3d at 998. Thus, as above, the Eighth Amendment provides the clearly established standards for determining when conditions of confinement violate the Constitution. *See Hydrick,* 500 F.3d at 988; *id.* at 997 n. 15 ("Although the Eighth Amendment does not apply here, similar standards may apply to [civilly committed persons] under the Fourteenth Amendment."). Under the Eighth Amendment, conditions of confinement constitute cruel and unusual punishment if a person is "deprived of the minimum civilized measure of life's necessities" and a state actor "acted with deliberate indifference to a substantial risk of serious harm." *Frost,* 152 F.3d at 1128.

No reasonable person in the position of Defendants would have known that the conditions Plaintiff complains of would fall below the standard articulated under the Eighth Amendment. That is, no reasonable psychiatric hospital employee would know that a crowded, "grimy" room might deprive a patient of the minimum civilized measure of life's necessities; or that replaying a video or ringing a walkie-talkie in a patient's ear would do so; or that depriving a patient of the use of his possessions for up to four hours a day could constitute such a deprivation. No reasonable psychiatric hospital staff member would have known that such conditions created "a substantial risk of serious harm." Therefore, Defendants are entitled to qualified immunity from this claim.

**E.** *The Consent Judgment Does Not Create A Liberty Interest That Protects Plaintiff*

 Plaintiff claims that Defendants' actions and omissions underlying Plaintiff's

inadequate health care and excessive force claims violated a liberty interest created by the Consent Judgment, which was made applicable to Patton on August 16, 2006. (*See* TAC at 7–8, ¶¶ 13, 19, 20, 23, 24; *id.* at 11–12, ¶ 42; *id.* at 14–15, ¶ 60; Plaintiff's MPSJ at 1; Endsley Decl. at 2, ¶ 3; Order Amending Consent Judgment at 2). However, the Consent Judgment does not create a liberty interest that protects Plaintiff.

The Consent Judgment includes an Enhancement Plan, which outlines goals for improved standards of care at the covered institutions. (*See* Consent Judgment at 3–81). The Effective Date of the Consent Judgment was June 1, 2006; however, the original Consent Judgment did not cover Patton. (*See id.* at 1 (stating the Consent Judgment applied to Metropolitan State Hospital and Napa State Hospital); *id.* at 5, 90 (stating the "Effective Date" of the Consent Judgment is "the first day of the month following [May 15, 2006,] the date of execution of the agreement")). It was not made applicable to Patton until August 16, 2006.[15] (Order Amending Consent Judgment at 2); *see Smith*, 994 F.2d at 1406 n. 4 ("A consent decree . . . only creates obligations that run to the parties to the decree, and only while the decree is . . . in force."). Under the original Consent Judgment, implementation of most of the provisions of the Enhancement Plan was to

begin within one year of the Effective Date; however, most of the provisions of the Enhancement Plan were not required to be fully implemented until thirty-six months after the Effective Date. (*See* Consent Judgment at 5, 88).[16] The Consent Judgment was amended on February 27, 2007. (*See* Amended Consent Judgment at 91). Under the Amended Consent Judgment, implementation of the Enhancement Plan's provisions was to begin within one year of the Amended Consent Judgment's Effective Date, which was March 1, 2007, and were to be completed within three years of that date. (*See id.* at 6, 89). Thus, under the Amended Consent Judgment, implementation was to begin by March 1, 2008 and be completed by March 1, 2010.

Plaintiff was transferred away from Patton prior to June 6, 2008. Thus, he resided at Patton for, at most, three months and five days after the date on which Patton was required to have *begun* implementation under the Amended Consent Judgment. He was transferred to a different institution more than one year and eight months before the Amended Consent Judgment required implementation of the Enhancement Plan.[17] Any liberty interest created by the provisions of the Enhancement Plan in the Amended Consent Judgment cannot, therefore, have applied to him.

---

**15.** In discussing his excessive force claims, Plaintiff seems to assert that the Consent Judgment became effective on May 2, 2005, "two months prior to Plaintiff's first incident of excessive force." (TAC at 11–12, ¶ 42). He is mistaken. The Consent Judgment clearly states its effective date is "the first day of the month following the date of execution of the agreement." (Consent Judgment at 5). It was executed on May 15, 2006. (*Id.* at 90). Thus, its effective date was June 1, 2006, which is more than ten months *after* July 25, 2005, the date of the most recent incident of alleged excessive force about which Plaintiff complains. Moreover, as noted, it did not

become applicable to Patton until August 2006.

**16.** The exceptions—the provisions regarding potentially harmful environmental conditions and suicide prevention (*see id.* at 74–75, 88)—are not at issue in this case.

**17.** Even measuring from the Effective Date of the original Consent Judgment—June 1, 2006—Plaintiff was transferred almost one year prior to the date that the Enhancement Plan's provisions were to be fully implemented.

�882Moreover, even if Plaintiff were a patient at Patton after the Amended Consent Judgment required implementation of the Enhancement Plan's provisions, the Amended Consent Judgment still would not have protected him, because it does not create a liberty interest on which he could rely.[18] The Ninth Circuit has held that a consent judgment can, in certain circumstances, create a protected liberty interest. *See Smith*, 994 F.2d at 1406 ("[W]e hold that consent decrees can create liberty interests protected by the Fourteenth Amendment."). However, a consent judgment, like a state law, creates such a liberty interest only if it "places substantive limitations on official discretion" by "(1) establishing substantive predicates to govern official decisionmaking, and (2) using explicit mandatory language, i.e., specific directives to the decisionmaker that if the [consent judgment's] substantive predicates are present, a particular outcome must follow." *Id.* at 1405 (internal quotation marks and citation omitted).

The Amended Consent Judgment does not place substantive limits on the discretion of Patton's administrators. The Amended Consent Judgment does outline generalized changes that the covered hospitals "shall" make. (*See, e.g.,* Amended Consent Judgment at 6) ("Each State Hospital shall use a Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery."); *id.* at 7 ("Each State Hospital shall provide coordinated, comprehensive, individualized protections, services, supports, and treatments ...."); *id.* at 9 ("Each State Hospital shall develop and implement policies and protocols regarding the development of therapeutic and rehabilitation service plans ....").

However, the Amended Consent Judgment reserves to state officials complete discretion on how to achieve these goals: "[T]he Defendants retain the discretion to achieve compliance by any legal means available to them .... The Agreement is the product of two governmental agencies exercising their expertise." (*Id.* at 86). Thus, the Amended Consent Judgment does not limit official discretion because it "places no substantive limitation on *how*" the state is to achieve its goals. *See Carver v. Lehman*, 558 F.3d 869, 875 (9th Cir.2007) (as amended) (holding a state law did not create a liberty interest when, although it gave officials "no discretion to decide *whether* or *when* to consider an offender for transfer to community custody," it also placed "no substantive limitation on *how* the [decisionmaker] is to make that determination" (internal quotation marks omitted)). Nor does the required appointment of a Monitor to "monitor the State's implementation" of the Enhancement Plan cabin official discretion. (Amended Consent Judgment at 83). Although the Monitor may make recommendations, he "shall not be empowered to direct the Defendants to take, or to refrain from taking, any specific action to achieve compliance." (*Id.* at 86). The Amended Consent Judgment's "manifest purpose" is "to *preserve* ... the discretion" of the hospital administrators. *Carver*, 558 F.3d at 876.

▪ Even assuming that the Amended Consent Judgment provides the requisite "substantive predicates," it fails to meet the second prong of the test, which requires specific directives to the decisionmaker that if those substantive predicates are present, a particular outcome must

---

18. The substance of the Amended Consent Judgment's Enhancement Plan is identical in all relevant particulars to the original Consent Judgment's Enhancement Plan. *See* Amended Stipulation to Amend Consent Judgment and

Agreement, *United States v. California,* Case No. CV 06–2667 (C.D.Cal. Nov. 21, 2006) (setting out the differences between the Consent Judgment and the Amended Consent Judgment).

follow. Under its terms, it is not necessary that the covered institutions be in substantial compliance before the Amended Consent Judgment is terminated. Rather, it terminates of its own force five years after the Effective Date. (*Id.* at 90). Moreover, even if the parties agree that the hospitals have been in substantial compliance with the Enhancement Plan for eighteen months, the Consent Judgment "*may* terminate at an earlier date." (*Id.* (emphasis added)). This "classically permissive language" is diametrically opposed to the "explicitly mandatory language" required to create a protected liberty interest. *Carver*, 558 F.3d at 874–75. In sum, the Amended Consent Judgment does not provide Plaintiff a protected liberty interest under which he can recover.

### F. *Plaintiff's State Law Claims Must Be Dismissed*

██ Plaintiff asks for summary judgment on his state law tort claims of harassment, assault and battery, negligence, and perjury. (Plaintiff's MPSJ at 14–15; TAC at 6). Defendants assert that the tort claims cannot succeed because Plaintiff failed to file a complaint with the Victim Compensation and Government Claims Board, as required by the California Tort Claims Act. (Defendant's MSJ at 23–24; Reply at 24–25). Plaintiff's state law claims must be dismissed.[19]

Plaintiff argues that the requirements of the California Tort Claims Act do not apply in federal court. (Plaintiff's MPSJ at 15). Plaintiff is mistaken. Although state law does not apply to Plaintiff's *federal*

claims-that is, his claims brought under 42 U.S.C. § 1983-state law, including "state-imposed procedural conditions to sue," applies to his state tort claims. *Ortega v. O'Connor*, 764 F.2d 703, 707 (9th Cir.1985), *rev'd on other grounds*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 627 (9th Cir.1988).

California law bars an action for damages against a public employee acting in the scope of his employment, unless, prior to filing the action, a written claim has been presented to and acted on by the employing entity. Cal. Gov't Code §§ 950.2, 945.4. Here, Plaintiff sued current and former employees of the California Department of Mental Health, a state agency. When the employing entity is the state or a state agency, the claim must be presented to the Victim Compensation and Government Claims Board within six months of accrual of the claim. *Id.* at §§ 900.2, 900.6, 911.2. The plaintiff must allege facts demonstrating that either that the claim was either timely presented or that presentation was excused in order to state a claim for relief. *See Butler v. L.A. County*, 617 F.Supp.2d 994, 1001 (C.D.Cal. 2008) (collecting cases).

██ Plaintiff has failed to allege, either in the Third Amended Complaint or elsewhere, that he timely presented a written claim to the Victim Compensation and Government Claims Board regarding any of the state law torts he alleges. He asserts in the Third Amended Complaint that he filed grievances and sent them to

---

19. Defendants do not appear to argue that Plaintiff's claim that Defendants committed "the tort of deprivation of personal property" under California Code of Regulations, title 9, section 884(b)(1) must also be dismissed for failure to comply with the California Tort Claims Act, instead asserting that the regulation does not create a private cause of action and that, even if it did, the *de minimis* depri-

vation he has allegedly suffered does not state a claim under it. (Defendants' MSJ at 25). The Court has already determined that Plaintiff has not stated a claim under the regulation. *See* Section V.D.3, *supra*. However, Plaintiff's failure to comply with the exhaustion requirements of the California Tort Claims Act provides an independent basis to dismiss this claim.

Defendant Luna and/or former-Defendant Singh. (*See, e.g.,* TAC at 8, ¶¶ 21–23; *id.* at 10–11, ¶¶ 34–40; *id.* at 14 ¶¶ 54–59). In his Motion for Partial Summary Judgment, he asserts that he "identif[ied] a claim he made to the State Personnel Board."[20] (Plaintiff's MPSJ at 15). This apparently refers to a complaint he filed against Defendant Bellamy. (*See* Second Barnouw Decl. at 2–3, ¶ 5; *id.* at Exh. 2). This does not constitute compliance with the exhaustion requirements of the California Tort Claims Act. Moreover, Plaintiff admitted that he did not file any claims with the State of California regarding any of the other Defendants. (*See* Second Barnouw Decl., at 2–3, ¶ 5; *id.* at Exh. 2). Thus, Plaintiff's state law tort claims must be dismissed. *See Butler,* 617 F.Supp.2d at 1002; *see also Karim–Panahi,* 839 F.2d at 627.

### G. *Plaintiff's Injunctive And Declaratory Relief Claims Are Moot*

 Plaintiff was transferred from Patton to Atascadero State Hospital sometime prior to June 6, 2008. (*See* Address Change). Generally, an inmate's transfer from one institution to another will moot any claims for injunctive relief relating to the former institution's practices or policies unless the suit is certified as a class action. *See Dilley v. Gunn,* 64 F.3d 1365, 1368 (9th Cir.1995).

 The only exception conceivably applicable here is for actions that are "capable of repetition, yet evading review." *Id.* This "narrow" exception applies when "[1]the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and [2] there [is] a reasonable expectation that the same complaining party would be subject to the same action again." *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.,* 893 F.2d 1012, 1016 (9th Cir.1989) (alterations in original). Plaintiff's situation meets neither of these requirements.

Plaintiff requests injunctive relief relating to longstanding treatment or disciplinary policies and decisions at Patton.[21] Plaintiff has failed to identify any policy so fleeting that it would be impossible for a claim to be fully litigated before cessation; indeed, according to Plaintiff's Third Amended Complaint, each policy lasted from, at the latest, 2005 until his transfer in 2008. (*See* TAC at 7, ¶ 19 (Plaintiff received his first Mall treatment schedule in 2004); *id.* at 8, ¶ 23 (Plaintiff's Industrial Training and patient government posts taken away in 2005); *id.* at 11, ¶ 40 (alleged false statements made in 2005); *id.* at 14, ¶ 53 (policy requiring patients to attend Treatment Mall or go to Refusal Room established in 2004)).

Moreover, there is no reasonable probability that Defendants (the parties against whom injunction is sought) will again subject Plaintiff to the same alleged injuries of which he complains. Plaintiff has been transferred to a different institution and

---

**20.** The State Personnel Board "administer[s] the civil service system and ensure [s] that state employment is based on merit and free of political patronage." About the State Personnel Board, http://www.spb.ca.gov/about/index.htm. It does not "resolve claims against State agencies and employees for money or damages," as does the Victim Compensation and Government Claims Board. California Victim Compensation and Government Claims Board, http://www.boc.ca.gov/about.aspx.

**21.** Plaintiff seeks injunctive requiring Defendant Luna to (1) arrange for the prescription of a different course of treatment; (2) restore Plaintiff's Industrial Therapy assignment or provide another appropriate Industrial Therapy assignment; (3) remove requirements that Plaintiff comply with Mall treatment; and (4) "expunge allegations of assaultiveness from . . . [P]laintiff's institutional record." (TAC at 17).

has presented no evidence that he is likely to be transferred back to Patton. Thus, the Court does not find that the actions or omissions for which he seeks injunctive relief are capable of repetition. *See Dilley,* 64 F.3d at 1369 (holding injunctive relief claims moot when Plaintiff did not demonstrate a reasonable probability that he would be transferred back to the institution that subjected him to injury).

 Plaintiff's claims for declaratory relief must also be denied. Although claims for declaratory relief can survive after claims for injunctive relief are moot (*see, e.g., Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 121–22, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974)), "[a] case or controversy exists justifying declaratory relief only when the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Headwaters,* 893 F.2d at 1015 (internal quotation marks and ellipses omitted). "The adverse effect ... must not be so remote and speculative that there is no tangible prejudice to the *existing interests* of the parties." *Id.* (internal quotation marks and brackets omitted).

Plaintiff asks for a declaration that a number of the actions or omissions that are the subject of his damages action were unconstitutional or violated state law.[22] Thus, his action for declaratory relief is subsumed by his damages action. *See Rhodes v. Robinson,* 408 F.3d 559, 566 n. 8 (9th Cir.2004) ("And because his claim for damages necessarily entails a determination whether the officers' alleged conduct violated his rights, his separate request for declaratory relief is subsumed by his damages action."). Moreover, as noted above, Plaintiff has been transferred from Patton, where each of these events allegedly occurred. He does not face "a continuous, remediable harm that concretely affects [his] existing interests." *Feldman v. Bomar,* 518 F.3d 637, 643 (9th Cir.2008).

 Finally, to the extent that Plaintiff has not abandoned his request for a "declaratory judgment" that "[a]ny damages awarded the plaintiff will not be seized by the state or any of its agencies for cost-of-care" (*id.,* Declaratory Relief Requested ¶ 15) by failing to present any argument in support of the request, Plaintiff lacks standing to request this relief. Any seizure is contingent on the state first acting to seize such damages. Plaintiff has not alleged or demonstrated that any state action has commenced, is imminent, or is

---

**22.** Specifically, he asks for a declaration that the following actions or omissions violated the law: (1) the physical force perpetrated against him at Patton by hospital employees (TAC at 16, Declaratory Relief Requested ¶ 1); (2) Defendant Luna's failure to stop the force (*id.,* Declaratory Relief Requested ¶¶ 2–4); (3) Defendant Benson's modification of Plaintiff's treatment plan (*id.,* Declaratory Relief Requested ¶ 5); (4) Defendant Luna's "failure to curb the known pattern of depriving [P]laintiff the use of his possessions" (*id.,* Declaratory Relief Requested ¶ 6); (5) Luna's instruction to his subordinates to lock Plaintiff out of his room and force him into the Refusal Room when he refused Mall Treatment (*id.,* Declaratory Relief Requested ¶ 7); (6) Defendants Armas–Carl and Loyarte's actions in overcrowding the Refusal Room (*id.,* Declaratory Relief Requested ¶ 9); (7) Defendant Armas–Carl's threat to use physical force against Plaintiff (*id.* at 17, Declaratory Relief Requested ¶ 10); (8) Patton employees' practice of forcing Plaintiff to stay awake (*id.,* Declaratory Relief Requested ¶ 11); (9) Defendant Monroe's action in pulling a chair from under Plaintiff (*id.,* Declaratory Relief Requested ¶ 12); (10) Defendant Birk's "blaring a radio in [P]laintiff's ear" (*id.,* Declaratory Relief Requested ¶ 13); and (11) Defendants Siregar and Atkins's false report that Plaintiff was assaultive (*id.,* Declaratory Relief Requested ¶ 14).

even likely. Thus, there is no case or controversy justifying such a declaration. *See Headwaters,* 893 F.2d at 1015 ("A case or controversy exists justifying declaratory relief only when the challenged government activity ... is not *contingent* ...." (internal quotation marks omitted and emphasis added)). Accordingly, Plaintiff has failed to demonstrate any entitlement to declaratory relief.

## VI.

### RECOMMENDATION

IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; (2) denying Plaintiff's Motion for Partial Summary Judgment; (3) granting Defendants' Motion for Summary Judgment on Plaintiff's claims under 42 U.S.C. § 1983; (4) granting Defendants' Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's state law claims; (5) dismissing Plaintiff's state law claims; (6) dismissing Plaintiff's claims for injunctive and declaratory relief; and (7) entering Judgment in favor of Defendants and against Plaintiff.